IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ZS ASSOCIATES, INC., et al.          :               CIVIL ACTION
                                     :               NO. 10-4274
          v.                         :
                                     :
SYNYGY, INC.                         :

O'NEILL, J.                                          MAY 23, 2011

MEMORANDUM

Plaintiffs ZS Associates, Inc. and ZS Associates International, Inc.[1] have filed a three

count complaint against defendant Synygy, Inc., alleging (1) defamation; (2) commercial

disparagement; and (3) violation of the Lanham Act.  Synygy moves to dismiss the complaint.

Presently before me are Synygy's motion to dismiss, ZS's response and Synygy's reply.  For the

following reasons, I will grant in part and deny in part Synygy's motion.

BACKGROUND

ZS and ZSAI are sales and marketing consulting firms.  They provide to their clients,

among other things, "incentive compensation services" which include "consulting,

administration and software services."  Compl. ¶ 7.  Synygy is ZS's competitor in the IC services

marketplace.

In August 2007, Synygy filed a seven count complaint against ZS.[2]  On August 5, 2009,

Synygy amended its complaint, naming ZSAI and Novo Nordisk as additional defendants and

---

[1]     Though plaintiffs are separate corporations, they are affiliated and appear to
provide similar services.  Compl. ¶ 6.  Throughout this opinion, I will jointly refer to ZS and
ZSAI as "ZS."

[2]     The original complaint contained the following seven counts: (1) Lanham Act
violations, (2) misappropriation of trade secrets, (3) conversion of intellectual property, (4)
intentional interference with prospective business relations, (5) unfair competition, (6) unjust
enrichment/quantum meruit and (7) doctrine of inevitable discovery.

adding ten counts to the original seven.[3]  On August 6, 2009, Synygy released the following

statement in the form of a press release:

> Synygy Inc., the largest and most experienced provider of sales
> performance management (SPM) solutions, today announced it has
> filed a lawsuit against ZS Associates of Evanston, IL, alleging
> copyright infringement, misappropriation of intellectual property, and
> theft of trade secrets.
>
> The complaint, filed in the District Court of Eastern Pennsylvania,
> alleges that ZS Associates and its affiliate, ZS Associates
> International, knowingly and improperly copied and misappropriated
> components of Synygy's sales compensation software and other
> intellectual property, and in addition, intentionally hired former
> Synygy employees, despite knowing about the existence of their non-
> compete agreements with Synygy, to gain access to confidential
> information acquired during their tenure with Synygy.
>
> Synygy seeks relief including:
> - judgment that ZS infringed Synygy's copyrights
> - injunction that prohibits ZS from continued use of Synygy's
>   software and other intellectual property
> - injunction from luring and/or hiring employees of Synygy or
>   its affiliates
> - judgment for actual and compensatory damages for loss of
>   revenue, profit, and company valuation

[3]     The amended complaint contained the following seventeen counts: (1) copyright infringement against ZS and Novo, (2) misappropriation of trade secrets under New Jersey Common Law against ZS and Novo, (3) violation of Pennsylvania Uniform Trade Secrets Act against ZS and Novo, (4) violation of New Jersey Fair Trade Act against ZS and Novo, (5) unfair competition under New Jersey common law against ZS and Novo, (6) breach of contract against Novo, (7) tortious interference with existing and prospective contractual relations against ZS, (8) Lanham Act violations against ZS and ZSAI, (9) violation of Pennsylvania Uniform Trade Secrets Act against ZS and ZSAI, (10) misappropriation of trade secrets under New Jersey common law against ZS and ZSAI, (11) violation of New Jersey Fair Trade Act against ZS and ZSAI, (12) tortious interference with existing and prospective economic advantage against ZS and ZSAI, (13) conversion of intellectual property against ZS and ZSAI, (14) intentional interference with actual and prospective contractual relations against ZS and ZSAI, (15) unfair competition under New Jersey common law against ZS and ZSAI, (16) unjust enrichment/quantum meruit against ZS and ZSAI, (17) doctrine of inevitable discovery against ZS and ZSAI.

•     punitive damages for acts of willful infringement

"Synygy created the market for sales compensation management (SCH) software and services more than 18 years ago," said Mark A. Stiffler, Synygy president and CEO. "We have invested many years and a lot of money in product development, which led to Synygy creating the SCM software that has propelled our success year after year. Our intellectual property is a very valuable asset and we are firmly committed to protecting it," he said.

"The lawsuit we filed today contends that ZS knowingly copied our software and other confidential information with the intent to use our intellectual property in direct competition with us. Our position is that ZS continues to use our software and other confidential information, causing us to lose substantial revenue, profit, and company valuation, while they profit from its use," continued Stiffler. "There is no way we can fully recover what we have lost from what we contend was deliberate and malicious misconduct, but we urge the Court to restrain ZS from continuing to infringe on our intellectual property and to award Synygy damages as the Court deems appropriate."

**About Synygy**

Synygy is the largest and most experienced provider of sales performance management (SPM) software and services. Synygy's SPM solutions include: sales compensation (incentive compensation, rewards and recognition, and total compensation); sales communications (web portals, reports and dashboards, and analytics, alerts, and answers); sales goals (territories and channels, forecasting and pipeline analysis, and objectives and quotas); and sales processes (reviews, recruiting and training, data repository and data processes, and workflow processes). Based in Chester, Pennsylvania, with extensive operations in Europe and Asia, Synygy has achieved 18 continuous years of success. www.synygy.com

Approximately one year later, ZS and ZSAI filed this lawsuit, contending that the press release set forth above was defamatory, commercially disparaging and in violation of the Lanham Act. See Compl. ¶¶ 15-41 (Count I: defamation); ¶¶ 42- 49 (Count II: commercial disparagement); ¶¶ 50-58 (Count III: Lanham Act Violation).

STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) permits a court to dismiss all or part of an action for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Typically, "a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations," though plaintiff's obligation to state the grounds of entitlement to relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). "Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the allegations in the complaint are true (even if doubtful in fact)." Id. (citations omitted). The complaint must state "'enough facts to raise a reasonable expectation that discovery will reveal evidence of' the necessary element." Wilkerson v. New Media Tech. Charter Sch. Inc., 522 F.3d 315, 321 (3d Cir. 2008), quoting Twombly, 550 U.S. at 556. The Court of Appeals has recently made clear that after Ashcroft v. Iqbal, --- U.S. ---, 129 S. Ct. 1937, 1955, 173 L. Ed. 2d 868 (2009), "conclusory or 'bare-bones' allegations will no longer survive a motion to dismiss: 'threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.' To prevent dismissal, all civil complaints must now set out 'sufficient factual matter' to show that the claim is facially plausible." Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009), quoting Iqbal, 129 S. Ct. at 1949. The Court also set forth a two part-analysis for reviewing motions to dismiss in light of Twombly and Iqbal: "First, the factual and legal elements of a claim should be separated. The District Court must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions. Second, a District Court must then determine whether the facts alleged in the

4

complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" Id. at 210-11, quoting Iqbal, 129 S. Ct. at 1950. The Court explained, "a complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to 'show' such an entitlement with its facts." Id., citing Phillips v. Cnty. of Allegheny, 515 F.3d 224, 234-35 (3d Cir. 2008). "Where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not 'show[n]'–'that the pleader is entitled to relief.'" Iqbal, 129 S. Ct. at 1949.

DISCUSSION

Synygy moves to dismiss all three counts. I will address each argument in turn.

I.     Fair Report Privilege

First, Synygy argues that the statements contained in its press release are subject to the fair report privilege and therefore the defamation and commercial disparagement claims must be dismissed. ZS disagrees.

In Pennsylvania, a plaintiff claiming defamation bears the burden of proving: (1) the defamatory character of the communication; (2) its publication by the defendant; (3) its application to the plaintiff; (4) the understanding by the recipient of its defamatory meaning; and (5) the understanding by the recipient of it as intended to be applied to the plaintiff. Tucker v. Fischbein, 237 F.3d 275, 281 (3d Cir. 2001), citing 42 Pa. Cons. Stat. Ann. § 8343(a). In order to make out a claim for commercial disparagement, the plaintiff must establish: "(1) the statement is false; (2) the publisher either intends the publication to cause pecuniary loss or reasonably should recognize that publication will result in pecuniary loss; (3) pecuniary loss does in fact result; and (4) the publisher either knows that the statement is false or acts in reckless

disregard of its truth or falsity." Pro Golf Mfg., Inc. v. Tribune Review Newspaper Co., 809

A.2d 243, 246 (Pa. 2002). Synygy does not contend that the complaint inadequately alleges

either claim.

Instead, Synygy invokes the fair report privilege as a bar to ZS's claims. The fair report

privilege, as recognized by Pennsylvania courts, is contained in section 611 of the Restatement

(Second) of Torts. See Medico v. Time, Inc., 643 F.2d 134, 138 (3d Cir. 1981) (predicting that

the Pennsylvania Supreme Court would adopt section 611); Hanish v. Westinghouse

Broadcasting Co., 487 F. Supp. 397 (E.D. Pa. 1980) (discussing the adoption of the fair report

privilege). Section 611 provides "[t]he publication of defamatory matter concerning another in a

report of an official action or proceeding or of a meeting open to the public that deals with a

matter of public concern is privileged if the report is accurate and complete or a fair abridgement

of the occurrence reported."

ZS argues as a preliminary matter that the fair report privilege should not apply to non-

media defendants such as Synygy. The Pennsylvania Supreme Court has not decided this

question. See Medico, 643 F.2d at 138 n.9 ("Although Pennsylvania, as far as we can tell, has

not delineated the availability of the privilege, in light of the identity of defendant Time, Inc., we

need not decide at this time whether Pennsylvania would allow non-media defendants to claim

the fair report privilege.").

Even assuming that the privilege applies to non-media defendants generally,[4] I find that

the privilege is inapplicable to Synygy in this case. Comment c to section 611 states:

---

[4]       In light of my holding, infra, I need not decide whether the privilege applies to
non-media defendants.

> A person cannot confer this privilege upon himself by making the original defamatory publication himself and then reporting to other people what he had stated. This is true whether the original publication was privileged or not. Nor may he confer the privilege upon a third person, even a member of the communications media, by making the original statement under a collusive arrangement with that person for the purpose of conferring the privilege upon him.

The purpose of this exception is clear: it prevents a plaintiff from filing a lawsuit containing defamatory allegations[5] and then "reporting" such defamatory allegations with impunity. Although the Pennsylvania Supreme Court has not expressly adopted this exception to the privilege, I predict that, given the opportunity, it would do so because application of the exception advances the principle underlying the fair report rule.

The privilege, as set forth in section 611, is designed to accommodate competing interests. On one hand, the law of defamation recognizes that the republication of a defamatory statement can result in substantial harm to an individual's reputation. See Laurence H. Eldredge, Law of Defamation § 44 (1978), citing Harris v. Minvielle, 19 So. 925, 928 (La. Ct. App. 1896) ("[t]alebearers are as bad as talemakers"); see also Medico, 643 F.2d at 137 (noting that Pennsylvania has adopted the "republication rule" which subjects the republisher of a defamatory statement to the same liability as the original publisher would incur). On the other hand, when it comes to reporting on public judicial proceedings, "[t]he reporter is a surrogate for the public, permitting it to observe through the reporter's eyes how the business of government is being conducted." Rodney A. Smolla, Law of Defamation § 8:67 (2d ed. 2010). This important

---

[5]     Defamatory allegations contained in a complaint would be absolutely privileged. See Preiser v. Rosenzweig, 646 A.2d 1166, 1167 (Pa. 1994) ("[Pennsylvania common] law accords an absolute privilege of immunity to statements, whether defamatory or not, to pleadings and other papers filed in regular judicial proceedings.").

function would be seriously impeded if the reporter were subjected to potential liability every time he or she reported on a defamation claim.

The privilege strikes a careful balance between the potential for harm inflicted by the republication of defamatory statements and the need for transparency in judicial proceedings by granting immunity from liability for a report of defamatory statements made during official actions or proceedings so long as the report is accurate and complete. See Medico, 643 F.2d at 137 ("To ameliorate the chilling effect on the reporting of newsworthy events occasioned by the combined effect of the republication rule and the truth defense, the law has long recognized a privilege for the press to publish accounts of official proceedings or reports even when these contain defamatory statements."); see also Cowley v. Pulsifer, 137 Mass. 392, 393 (1884) (Holmes, J.) ("Though the publication of such proceedings may be to the disadvantage of the particular individual concerned, yet it is of vast importance to the public that the proceedings of courts of justice should be universally known. The general advantage to the country in having these proceedings made public, more than counterbalances the inconveniences to the private persons whose conduct may be the subject of such proceedings."). Comment c to section 611 seeks to maintain this careful balance by closing a potential loophole in the provision. The privilege was not "intended to permit a person maliciously to institute a judicial proceeding, alleging false and defamatory charges, then to circulate a press release or other communication based thereon, and, ultimately to escape liability by invoking the fair report privilege statute." See Stover v. Journal Pub. Co., 731 P.2d 1335, 1340 (N.M. Ct. App. 1985), citing Williams v. Williams, 246 N.E. 2d 333 (N.Y. 1969). Because the exception contained in comment c advances the salutory purposes underlying the privilege, I predict that the Pennsylvania Supreme

Court would adopt it.

The next question is whether the exception applies under the facts of the present case. I find that it does. The Knit With v. Knitting Fever, Inc., No. 08-4221, 2010 WL 3792200, at *3-5 (E.D. Pa. Sep. 28, 2010), is analagous. There, TKW filed a lawsuit alleging that KFI falsely represented that certain yarn that it sold contained a certain percentage of cashmere. The Knit With, 2010 WL 3792200, at *1. TKW then issued a press release that "summarized [the complaint] and included multiple quoted statements taken from an implied interview with [a co-owner of TKW]." Id. at *3. This prompted KFI to file a counterclaim alleging that the press release was defamatory. Id. at *4. TKW argued that it was entitled to immunity for the issuance of the press release under the fair report act. Id. at *4. Relying on comment c, the Court disagreed. Id. at *5. It held that

> [t]o now extend the fair report privilege to [the circumstances of this case] would allow individuals to make defamatory statements in judicial filings, write and disseminate press reports about those filings, provide additional defamatory commentary in such reports, and then avoid all liability for those statements under the claim of privilege. Given the illogic of such a position, the Court declines to find Plaintiff's statements protected by the fair report privilege.

Id.

Kurczaba v. Pollock, 742 N.E. 2d 425, 442-43 (Ill. App. Ct. 2000), is also instructive. In that case, both parties were attorneys. Pollock filed a class action lawsuit alleging misconduct on the part of, among others, the law firm of Whitcup & Acre. Shortly thereafter, Whitcup & Acre dissolved and many of its members, including Kurczaba, formed a new law firm–the Horn firm. In an attempt to attract new clients, "Horn distributed an advertisement to the legal community, in Polish, which announced the new firm and contained Kurczaba's photograph." Kurczaba, 742

N.E. 2d at 430. Pollock attached a copy of the complaint he had filed against Whitcup & Acre to the advertisement issued by Horn and sent the package to "various prominent members and institutions of the Chicago and Polish communities[.]" Id. As a result, Kurczaba sued Pollock for defamation. Pollock attempted to invoke the fair report privilege, arguing that the package he sent was merely an accurate and complete report of the official proceedings. Id. at 442. The Court disagreed, noting "[i]n the instant case, defendant made the original defamatory publication (the . . . complaint) and then 'reported' the same matter to others. Based on this alone, the fair report of judicial proceedings privilege is not available to defendant.").

The present case is indistinguishable from The Knit With and Kurczaba. Here, just as in those cases, Synygy filed a complaint that included arguably defamatory statements concerning ZS and ZSAI. Then, it issued a press release describing the complaint in some detail and republishing the allegedly defamatory statements. Under these circumstances, Synygy cannot invoke the fair report privilege. See Restatement (Second) of Torts § 611, cmt. c.

Accordingly, I will deny Synygy's motion to dismiss the defamation and commercial disparagement claims on the basis of the fair report privilege.

II.    Lanham Act Claim

Synygy advances several arguments in support of its motion to dismiss ZS's Lanham Act claim.[6] In its reply to ZS's original brief in opposition to the motion to dismiss, Synygy argued that the Lanham Act claim must be dismissed because "ZS has failed to aver how a press release

---

[6]    In a footnote to Synygy's original brief, Synygy conceded that the fair report privilege is not a defense to plaintiffs' Lanham Act claim but argued that the allegedly defamatory statements could not support a Lanham Act claim. I ordered additional briefing on the legal sufficiency of the Lanham Act claim in this case.

citing sales puffery and allegations of a public complaint is 'commercial advertising or promotion.'" Rep. Br. at 10. In its supplemental brief, Synygy makes four additional arguments is support of dismissal of ZS's Lanham Act claim: (1) the allegedly deceptive statements contained in the press release pertain to the authorship of Synygy's services–a claim which the Supreme Court has held not to be actionable under the Lanham Act; (2) the allegedly deceptive statements are not false or misleading; (3) the allegedly deceptive statements are not actually deceptive nor did they have a tendency to deceive; and (4) to the extent that the statements were both false and deceptive, they were unlikely to affect purchasing decisions. ZS disagrees with each of Synygy's contentions. I will discuss each argument in turn.

Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), provides:

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which-

>> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

>> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act

In order to make out a Lanham Act claim, the plaintiff must allege that: "1) the defendant has made false or misleading statements as to his or her or another's product or services; 2) there is

actual deception or at least a tendency to deceive a substantial portion of the intended audience; 3) the deception is material in that it is likely to influence purchasing decisions; 4) the advertised goods traveled in interstate commerce; and 5) there is a likelihood of injury to the plaintiff in terms of declining sales and loss of good will." Synygy, Inc. v. Scott-Levin, Inc., 51 F. Supp. 2d 570, 575 (E.D. Pa. 1999), citing U.S. Healthcare, Inc. v. Blue Cross of Greater Phila., 898 F.2d 914, 922-23 (3d Cir. 1990).

> A.      The Press Release at Issue Constitutes Commercial Advertising or Promotion

Synygy first argues that the press release issued in this case was not "commericial advertising or promotion" for the purposes of the Lanham Act. I disagree. Commercial advertising is defined as "(1) commercial speech; (2) by a defendant in commercial competition with the plaintiff; (3) for the purposes of influencing consumers to buy the defendant's goods or services; and (4) that is sufficiently disseminated to the relevant purchasing public to constitute advertising or promotion within the industry." Caldon, Inc. v. Advanced Measurement & Analysis Grp., Inc., 515 F. Supp. 2d 565, 578 (E.D. Pa. 2007). "The form of the statements is not dispositive, and courts find statements to be commercial speech even where promulgated outside the traditional advertising campaign." Accenture Global Servs. GMBH v. Guidewire Software, Inc., 581 F. Supp. 2d 654, 667 (D. Del. 2008). There is no dispute that Synygy and plaintiffs are in commercial competition.

"Three factors are used in determining whether speech is commercial: 1) is the speech an advertisement; 2) does the speech refer to a specific product or service; and 3) does the speaker have an economic motivation for the speech." Premier Comp. Solutions, LLC v. Workwell

Physical Med., Inc., No. 10-1117, 2010 WL 4342247, at *3 (W.D. Pa. Oct. 27, 2010), citing U.S. Healthcare, Inc., 898 F.2d at 933. The press release at issue here describes the services that Synygy provides and discusses the value that they provide to Synygy's clients. The release is intended not only to set forth Synygy's legal claims but also to persuade potential clients to choose Synygy over ZS. Indeed, the section of the release entitled "About Synygy" states "Synygy is the largest and most experienced provider of sales performance management (SPM) software and services." That same section concludes "Synygy has achieved 18 continuous years of success." Accordingly, I find that the press release at issue constituted commercial speech and that it was issued "for the purpose of influencing consumers to buy the defendant's goods or services."[7] See Caldon, Inc., 515 F. Supp. 2d at 578.

Finally, I find that the press release was disseminated in such a way as to constitute promotion. Synygy submitted the release to influential media outlets including Reuters, Yahoo Finance and Intellectual Property Today. Compl. ¶ 21. Given that such media outlets target an audience that would be interested in Synygy's "sales performance management solutions," the press release constituted "advertising or promotion within the industry." See Star-Brite Distrib., Inc. v. Kop-Coat, Inc., No. 09-60812, at *3 (S.D. Fla. March 4, 2010) (finding a press release to constitute "advertising or promotion within the industry where the defendant, a manufacturer of marine gasoline treatment, issued the release to "marine industry and online trade publication websites."); Sigma Dynamics, Inc. v. E. Piphany, Inc., No. 04-0569, 2004 WL2648370, at *3

---

[7]     I note that the inquiry whether a particular statement constitutes "commercial speech" is related yet distinct from the inquiry whether the statement was made "for the purposes of influencing consumers to buy the defendant's goods or services." Under the facts of this case, however, my analysis of the "commercial speech" element overlaps with my analysis of the purpose of the press release.

(N.D. Cal. June 25, 2004) ("As statements on websites and in press releases are generally available to the public at large, they satisfy the commercial speech requirement for purposes of a motion to dismiss, although more may be required at a later stage of the litigation."); Enzo Life Sci., Inc. v. Digene Corp., 295 F. Supp. 2d 424, 428 (D. Del. 2003) (finding press releases stating that the defendant owns a particular patent and that it intends to pursue infringement claims against the plaintiff constituted "commercial advertising or promotion.").  I will accordingly deny Synygy's motion to dismiss the Lanham Act claim on this basis.

> B.     Synygy's Press Release Contains Statements That Are Actionable Under Dastar

Synygy next argues that ZS has not alleged any actionable deceptive statements.  More specifically, it argues that the allegedly deceptive statements of which ZS complains pertain solely to the origin of the goods and services that Synygy produces and provides.  According to Synygy, following the Supreme Court's decision in Dastar Corp. v. Twentieth Century Fox Film Corp., 539 U.S. 23, 32 (2003), such allegations cannot support a Lanham Act claim.

> 1.     Dastar v. Twentieth Century Fox Film Corp.

In Dastar, Fox acquired the television rights to Dwight D. Eisenhower's book "Crusades in Europe" including the exclusive rights to distribute a 1940's television series based on the book.  Dastar, 539 U.S. at 25.  It restored the twenty-six episode television series and placed the whole series onto a set of videotapes.  Id.  Later, Dastar acquired a copy of the original television series, which was in the public domain, and edited it substantially.  Id.  Dastar then sold the edited version without crediting the producers of the original series in any way.  Id. at 27.  Fox and its co-plaintiffs filed a complaint alleging, inter alia, that "Dastar's sale of [the edited

version] 'without proper credit' to the Crusade television series constitutes 'reverse passing off' in violation of § 43(a) of the Lanham Act . . . ."  <u>Id.</u>

Plaintiffs argued that Dastar had "made a 'false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which . . . is likely to cause confusion . . . as to the origin . . . of his or her goods."  The question presented was whether "'origin' referr[ed] only to the manufacturer or producer of the physical 'goods' that are made available to the public" or whether "'origin' include[d] the creator of the underlying work that Dastar copied."  <u>Id.</u> at 31.  The Court adopted the former definition, concluding "that the phrase refers to the producer of the tangible goods that are offered for sale, and not to the author of any idea, concept, or communication embodied in those goods."  <u>Id.</u> at 37.  According to the Court, "[t]o hold otherwise would be akin to finding that § 43(a) created a species of perpetual patent and copyright, which Congress may not do."  <u>Id.</u>  The Court noted in dicta, however, that its holding applied only to "the 'confusion . . . as to the origin' provision of § 43(a)(1)(A)" not to the "'misrepresents the nature, characteristics [or] qualities' provision of § 43(a)(1)(B)."  <u>Id.</u> at 38.

2.      Courts Applying <u>Dastar</u> to Claims Brought Under Section 43(a)(1)(B)

The question presented in this case is whether plaintiffs may recover under section 43(a)(1)(B) for Synygy's alleged misrepresentation as to the creator of Synygy's sales performance management solutions.  Although I have found no precedential opinion by the Court of Appeals addressing this question, other Courts have answered it in the negative.  <u>See</u>, <u>e.g.</u>, <u>Baden Sports, Inc. v. Molten USA, Inc.</u>, 556 F.3d 1300, 1307-08 (Fed. Cir. 2009).  In <u>Baden</u>, both parties were manufacturers of high-end basketballs.  <u>Baden</u>, 556 F.3d at 1302.  The

15

plaintiff claimed, inter alia, that the defendant had violated the Lanham Act by falsely advertising

that its "dual cushion technology" was its own "exclusive, proprietary, and innovative

technology" when, in fact, the defendant had copied the plaintiff's technology. Baden Sports,

Inc. v. Molten, No. 06-210, 2007 WL 2058673, at *1 (W.D. Wash. July 16, 2007). The plaintiff

conceded that in light of Dastar it had no claim under section 43(a)(1)(A). Baden, 556 F.3d at

1306. It argued instead that the defendant's advertisements constituted misrepresentations of

"the nature, characteristics, qualities, or geographic origin" of its basketballs and therefore

violated section 43(a)(1)(B). Id. The Court, applying precedent from the Court of Appeals for

the Ninth Circuit, held that the "'nature, characteristics, and qualities' language of Section

43(a)(1)(B) [does] not refer to the [authorship] of a copyrighted good" but refers instead to "'the

characteristics of the good itself.'" Id. at 1307 ("Following Sybersound's reasoning, we conclude

that authorship . . . is not a nature, characteristic, or quality, as those terms are used in Section

43(a)(1)(B) of the Lanham Act."), citing Sybersound Records, Inc. v. UAV Corp., 517 F.3d

1137, 1144 (9th Cir. 2008). It illustrated this distinction by reference to Sybersound, a case in

which the plaintiff alleged that the defendant had misrepresented the licensing status of its

karaoke recordings. Sybersound, 517 F.3d at 1144. In order to avoid problematic overlap

between the Lanham Act and the Copyright Act, the Court rejected the plaintiff's argument that

the "nature, characteristics and qualities" of each work included its licensing status. Id. Instead,

the Court held that "the nature, characteristics, and qualities of karaoke recordings under the

Lanham Act are more properly construed to mean characteristics of the good itself, such as the

original song and artist of the karaoke recording, and the quality of its audio and visual effects."

Id.

The District Court for the District of Delaware issued a similar decision in <u>Robert Bosch LLC v. Pylon Mfg. Corp.</u>, 632 F. Supp. 2d 362, 366-68 (D. Del. 2009). There, the plaintiff claimed that the defendant had falsely advertised its "frameless all-weather wiper blade" by stating that it "developed [the wiper blade and therefore], by implication, [that the plaintiff] did not develop the said frameless wiper blade." <u>Robert Bosch</u>, 632 F. Supp. 2d at 366. The Court held that the plaintiff's allegations did not state a claim under the Lanham Act because "'false attribution of the authorship' of an invention or innovation is not an actionable false advertisement under [the statute]." <u>Id.</u>

I agree with the Courts that have applied <u>Dastar</u> to claims arising under the false advertising prong of the Lanham Act. Such claims raise the very same concerns that the Court addressed in <u>Dastar</u>. If a plaintiff were allowed to bring suit under the Lanham Act on the grounds that the defendant falsely advertised that it had "originated the ideas or communications that 'goods' embody or contain," <u>see</u> <u>Sidem</u>, 2010 WL 2573882, at *7, <u>quoting</u> <u>Invista S.A.R.L. v. E.I. Du Pont De Nemours</u>, No. 08-7270, 2008 WL 4865208, at *1 (S.D.N.Y. Nov. 3, 2008), the plaintiff would, in effect, benefit from an eternal copyright. <u>See</u> <u>Dastar</u>, 539 U.S. at 33 ("To hold otherwise would be akin to finding that § 43(a) created a species of perpetual patent and copyright, which Congress may not do.").[8] I must therefore decide whether ZS's complaint

---

[8]     ZS cites three cases in which Courts have indicated that <u>Dastar</u> does not bar false attribution of authorship claims brought under section 43(a)(1)(B). <u>See</u> ZS's Br. at 6-7, <u>citing</u> <u>Zyla v. Wadsworth</u>, 360 F.3d 243, 252 n.8 (1st Cir. 2004); <u>Clauson v. Eslinger</u>, 455 F. Supp. 2d 256, 261 (S.D.N.Y. 2006); <u>Cathedral Art Metal Co. v. F.A.F., Inc.</u>, No. 05-315S, 2006 WL 2583584, ay *2-3 (D.R.I. Sept. 6, 2006). None of those Courts, however, included any substantive discussion in support of its decision. Instead, each Court simply cited to the <u>Dastar</u> Court's statement, in dicta, that "[i]f . . . the producer of a video that substantially copied the Crusade series were, in advertising or promotion, to give purchasers the impression that the video was quite different from that series, then one or more of the respondents might have a cause of

17

alleges that Synygy falsely advertised the authorship of its products and services.

3.      Application of <u>Dastar</u> and its Progeny to the Present Case

ZS argues that the allegations in its complaint do not implicate the holding of <u>Dastar</u>

because "ZS does not claim that Synygy misprepresent[ed] ZS's goods and services as Synygy's

own.  Rather, ZS alleges that Synygy misrepresented, for instance, that 'Synygy created the

market for sales compensation management (SCM) software and services more than 18 years

ago' and that ZS's own commercial activities involved knowingly copying and using Synygy's

software."  <u>See</u> Pl.'s Br. at 9, <u>quoting</u> Compl. ¶ 17.

a.      Claims that Directly Allege False Attribution of Authorship

I find that the complaint contains several direct allegations that Synygy's press release

_____

action–not for reverse passing off under the 'confusion . . . as to the origin' provision of §
43(a)(1)(A), but for misrepresentation under the 'misrepresents the nature, characteristics [or]
qualities' provision of § 43(a)(1)(B)."  As discussed in the text, I find more persuasive the
reasoning of the Courts that have applied <u>Dastar</u> to false attribution of authorship claims brought
under section 43(a)(1)(B).  <u>See</u> <u>Baden Sports, Inc.</u>, 556 F.3d at 1307-08; <u>Agence France Presse v.
Morel</u>, — F. Supp. 2d —, No. 10-2730, 2011 WL 147718, at *12 (S.D.N.Y. Jan. 14, 2011) ("The
import of <u>Dastar</u> that an author's recourse for unauthorized use is in copyright cannot be avoided
by shoe-horning a claim into section 43(a)(1)(B) rather than 43(a)(1)(A)."); <u>Antidote Intern.
Films, Inc. v. Bloomsbury Pub., PLC</u>, 467 F. Supp. 2d 394, 400 (S.D.N.Y. 2006) ("the holding in
<u>Dastar</u> that the word 'origin' in § 43(a)(1)(A) refers to producers, rather than authors, necessarily
implies that the words 'nature, characteristics, [and] qualities' in § 43(a)(1)(B) cannot be read to
refer to authorship."); <u>Sidem, S.A.</u>, 2010 WL 2573882, at *8 ("The Supreme Court's concern in
<u>Dastar</u> was the potential conflict with copyright or patent law. Plaintiffs' claim under §
43(a)(1)(B), regardless of its characterization as one involving goods, services, or commercial
activities, implicates that same concern highlighted by the Supreme Court."); <u>Gary Friedrich
Enters., LLC v. Marvel Enters., Inc.</u>, 713 F. Supp. 2d 215, 234 (S.D.N.Y. 2010) ("The plaintiffs
attempt to circumvent <u>Dastar's</u> holding by characterizing the defendants' misrepresentation as
false advertising, which the Act prohibits under subsection (B).  However, the holding of <u>Dastar</u>
extends to claims arising under subsection (B).").

falsely attributed to Synygy the authorship of ZS's products and services.  Such claims are barred

by Dastar.  For example, plaintiff may not base a false advertising claim on its allegation that

Synygy's press release "falsely suggest[s] and impl[ies] that Synygy was the market innovator

and that ZS's products and services are knock-offs of products and services that Synygy

developed."  Compl. ¶ 24.  Nor may it base a false advertising claim on Synygy's assertions that

"we have invested many years and a lot of money in product development, which led to Synygy

creating the SCM software that has propelled our success year after year."  See Compl. ¶ 17,

quoting Press Release ¶ 4.  Such statements by Synygy, and any others like them, can only be

false insofar as they assert that Synygy, and not ZS, created the products and services offered by

Synygy.  Such claims of false attribution of authorship are barred by the reasoning underlying

Dastar.[9]

                b.      Claims that Allege a False or Misleading Description of
                     Fact Which Misrepresents the Characteristics or Qualities
                     of Plaintiffs' Commercial Activities

ZS also argues that Synygy's press release falsely implies that ZS stole Synygy's software

and confidential information and hired its former employees "despite knowing about the

existence of their non-compete agreements with Synygy, to gain access to confidential

information acquired during their tenure with Synygy."  Press Release ¶ 2.  These allegations,

according to plaintiffs, implicate the "commercial activities" prong of the Act.  See 15 U.S.C. §

1125(a)(1)(B) ("Any person who, on or in connection with any goods or services . . . uses in

---

[9]      It is unclear whether ZS intends to pursue a Lanham Act claim under this theory.
The allegations in its complaint suggest that it does; however, in its supplemental brief it asserts
that "ZS does not claim that Synygy 'misrepresented' ZS's goods and services as Synygy's own."
ZS's Br. at 9.

commerce any . . . false or misleading description of fact, or false or misleading representation of

fact, which . . . in commercial advertising or promotion, misrepresents the nature, characteristics,

qualities, or geographic origin of his or her or another person's . . . commercial activities . . .

shall be liable in a civil action by any person who believes that he or she is or is likely to be

damaged by such act.").

The commercial activities prong was discussed in detail by the Court of Appeals for the

Tenth Circuit in Procter & Gamble Co. v. Haugen, 222 F.3d 1262, 1271-73 (10th Cir. 2000).

There, the plaintiff alleged that the defendants–Amway Corporation, a competitor of the plaintiff,

and Randy L. Haugen, Amway's agent "disseminated the rumor that [the plaintiff] is a corporate

agent of Satan." Haugen, 222 F.3d at 1267. Specifically, on an internet message board

accessible to thousands of Amway distributors, Haugen asserted that the plaintiff had announced

that it was associated with the church of satan and that "a large portion of the profits from [the

plaintiff's] products go to support [the] satanic church." Id. at 1268.

The District Court dismissed the plaintiff's claim on the grounds that the "subject

message, although 'identif[ying] . . . [the plaintiff's] products,' did not 'contain false

representations about the qualities or characteristics of those products,' and so did 'not relate to a

product within the meaning of the Lanham Act.'" Id. at 1270, quoting Procter & Gamble Co. v.

Haugen, No. 1:95 CV 0094K, at 3 (D. Utah Sept. 4, 1998) (Order). The Tenth Circuit agreed

with that conclusion but proceeded to consider whether the plaintiff's claims implicated the

commercial activities prong of the Act, an issue the District Court had not addressed.

Noting that the term "commercial activities" was not defined by the Act, the Court held

that the plain meaning of the term "encompasses 'commercial transactions' or all activities

surrounding the peculiar 'commerce' of a company, defined as 'the exchange or buying and selling of commodities.'" Id. at 1271-72, quoting Webster's Third New Int'l Dictionary (Unabridged) 456 (1993). The Court found that commercial activities include the manner in which a corporation spends its profits. Id. at 1272. Accordingly, "[a]llegations that [the plaintiff] tithes the church of Satan concern just such commercial activities." Id.

Haugen is at least facially analogous to the present case–allegations that plaintiffs conduct their business in an unethical manner are potentially as commercially damaging as allegations that Procter & Gamble was affiliated with the church of satan. This case includes an additional consideration, however, that was not present in Haugen. Namely, whether Dastar's rule against Lanham Act claims based on "false attribution of ownership" operates to bar this claim.

Synygy argues ZS's claim under the commercial activities prong is merely a repackaging of its false attribution of ownership claim. I disagree. The assertion that ZS stole Synygy's software and confidential information is of a categorically different nature than the assertion–which is barred by the reasoning underlying Dastar–that ZS's software and confidential information was originally created by Synygy. The former is an allegation that ZS conducts its commercial activities in an unethical manner while the latter amounts to a claim of copyright or patent infringement. I will therefore permit ZS to proceed with such claims. I note that the claim that ZS hired Synygy's employees in blatant disregard for the applicable non-competition agreements does not implicate Dastar in any way and therefore survives.

C.      ZS Has Adequately Alleged that the Statements Contained in Synygy's Press Release Were Misleading

Synygy next argues that none of the statements contained in its press release are false or

misleading.  The Court of Appeals has held that a statement is actionable under the Lanham Act

"if the commercial message or statement is either (1) literally false or (2) literally true or

ambiguous, but has the tendency to deceive consumers."  <u>Novartis Consumer Health, Inc. v.</u>

<u>Johnson & Johnson-Merck Consumer Pharm., Inc.</u>, 290 F.3d 578, 586 (3d Cir. 2002).  ZS argues

that "[a]nalyzing Synygy's message in its full context," the press release falsely conveys that ZS

engaged in improper commercial activities–an allegation that ZS contends is false or misleading.

I agree.  The fair import of the press release is that ZS stole software and confidential information

from Synygy and that it hired Synygy's former employees in blatant disregard for their non-

competition agreements.  At this stage, where I must accept as true all well pleaded allegations in

the complaint, no proof or evidence in support of the claims is required.  Following discovery,

however, ZS will be required to produce evidence that Synygy's statements were indeed false or

misleading.

> D.    Synygy Has Adequately Alleged that the False and Misleading Statements in the
> Press Release Caused Actual Deception or Displayed a Tendency to Deceive

Synygy next argues that ZS "cannot show that the [press release] created actual deception

or a tendency to deceive."  Synygy's Br. at 11.  ZS has alleged that the statements contained in

the press release were both false and misleading.  It has further asserted that the allegedly false or

misleading statements were published and disseminated to industry members and that, as a result,

ZS has suffered "harm to its reputation, loss of goodwill, and reduced demand for its goods and

services."  Compl. ¶ 33.  These allegations suffice to state a claim that Synygy's allegedly

misleading statements caused actual deception or displayed a tendency to deceive.  Again,

following discovery, ZS will be required to produce evidence establishing this element.

E.    Synygy Has Adequately Alleged that the False and Misleading Statements Were
       Likely To Affect Purchasing Decisions

Finally, Synygy argues ZS "has failed to support its claim that the press release . . . had or

may have [had] an impact on a potential purchas[er] . . . ."  Synygy's Br. at 12.  It asserts that

"[c]ase law is clear that to support a claim that customers were influenced by an alleged

misrepresentation a plaintiff must be able to show that those customers who potentially heard or

read the statements were influenced not to purchase the materials."  Id., citing Walker-Davis

Publ'ns, Inc. v. Penton/IPC, Inc., 509 F. Supp. 430, 437 (E.D. Pa. 1981).  I find that ZS has

adequately alleged that Synygy's alleged misreprepresentations were likely to affect purchasing

decisions.  As noted above, ZS has alleged that, as a result of Synygy's press release, it has

suffered "harm to its reputation, loss of goodwill, and reduced demand for its goods and

services."  Compl. ¶ 33.  No more is required at this stage.

III.    ZS's Complaint Is Not Subject To Dismissal Under Rule 13

Finally, Synygy argues that all three claims in ZS's complaint should have been pled as

counterclaims to the original lawsuit and therefore they must be dismissed.  I disagree.  First, no

answer has yet been filed in the original lawsuit and therefore ZS has not been afforded the

opportunity to plead its counterclaims.  Second, failure to plead a compulsory counterclaim is

only fatal to that counterclaim where judgment has already been entered in the related suit.

See Stanton v. City of Phila., No. 10-2726, 2011 WL 710481, at *4 (E.D. Pa. Mar. 1, 2011)

(citations omitted) ("Failure to assert a compulsory counterclaim before the related claim

proceeds to judgment results in the barring of the counterclaim.").  The res judicata bar is

inapplicable here because the related claim has not yet proceeded to judgment.  Nevertheless, in

order to vindicate the purposes of Rule 13, which was designed to promote judicial economy, I will consolidate this case with the original case docketed at No. 07-03536. See Elec. Lab. Supply Co., Inc. v. Motorola, Inc., No. 88-4494, 1989 WL 113127, at *11 (E.D. Pa. Sept. 20, 1989) ("where [related] claims are deemed compulsory counterclaims and are brought in a separate action before the same federal court, those claims can be consolidated in whatever manner is most convenient for the purposes of trial.").

## CONCLUSION

For the reasons discussed above, I will grant Synygy's motion to dismiss ZS's complaint to the extent that ZS intends to pursue its Lanham Act claim on the basis of Synygy's alleged false attribution of authorship of Synygy's products and services. In all other respects, I will deny the motion to dismiss.

An appropriate Order follows.